742 So.2d 626 (1999)
ALL SEASONS CONSTRUCTION, INC., Plaintiff-Appellant/Appellee,
v.
The CITY OF SHREVEPORT, Defendant-Appellant/Appellee.
No. 32,190-CA.
Court of Appeal of Louisiana, Second Circuit.
August 18, 1999.
Rehearing Denied September 16, 1999.
Writ Denied December 17, 1999.
*627 Mark W. Odom, Shreveport, Counsel for Plaintiff.
Hicks and Hubley by S. Maurice Hicks, Jr., Lydia M. Rhodes, Shreveport, Office of the City Attorney by Ramona N. Wallis, Shreveport, Counsel for Defendant.
Before CARAWAY, KOSTELKA, DREW, JJ.
KOSTELKA, J.
This suit arises out of the renovations to Independence Stadium undertaken in preparation for the arrival of the Pirates, a now-defunct Canadian Football League franchise briefly stationed in Shreveport. After the proper bidding procedure, the City awarded the contract to install new seating in certain areas of the stadium to All Seasons Construction, Inc. Both before and after the final bid date, and due to various cost concerns, the City of Shreveport (through its architect, the Newman Partnership) vacillated between using plastic seats without arms or adding seat backs to the existing aluminum planks for the area of the less expensive seats. The owner finally opted for the plastic seating at an increased cost and the stadium was substantially complete in time for the first football game.
All Seasons has filed suit against the City in an effort to collect unpaid sums, including the increased cost of the construction. In response, the City contests the added expenditures and asserts, that upon considering the unfinished work, stolen supplies, and additional architect fees, it has actually overpaid All Seasons. The City, accordingly, seeks a refund. The trial court reviewed the voluminous evidence and concluded that the City owes All Seasons an additional $88,988.65. Appeals by both parties ensued.
The trial court provided excellent, detailed reasons for judgment including eighty-one enumerated specific factual findings. The court's "Findings of Fact and Conclusions of Law" indicate a studied consideration of the issues presented; and, finding no error below, we adopt those reasons pertaining to the instant appeals and affirm:

"FINDINGS OF FACT AND CONCLUSIONS OF LAW
"This matter having come on regularly for trial, evidence adduced and the matter submitted on briefs, the court now renders this Findings of Fact and Conclusions of Law. Plaintiff itemizes its claims as follows:

 I Original General Contract
 Amount $983,960.00
 II Previously Executed Change
 Order + 19,337.00
 III Total Previously Amended Contract
 Amount = 1,003,297.00
 IV Total Payments by City to All
 Seasons - 955,125.90
 V Existing Balance Owed on Contract = 48,171.10
 VI Add Cost of Contour CS 150
 Seats + 269,182.55
 VII Added Sales Tax + 17,493.00
 VIII Deduct for Canceled Seating
 Contract (Rowley) - 245,858.00
 IX Added Labor to Stockpile Unused
 Seating + 12,351.60
 X Added Labor to Saw-cut & Cap
 Plank Seats + 3,573.00
 XI Expediting Fee Paid to Contour
 Seating + 12,000.00
 XII Added Demolition & Tread Extensions + 7,258.00
 XIII Added Steel Fabrication & Installation + 12,701.00
 XIV Added Cost of Supervision + 2,025.00
 XV Practice Field Bleachers + 3,139.12

*628
 XVI Contractual Overhead & Profit + 15,057.16
 XVII Added Premiums for Bond + 731.96
XVIII Total Principal Owed, Incl.
 Bond & Past Due ----$157,825.49
 ___________
 IXX Attorney Fees Claimed + 38,565.10
 XX Interest (No Figure Given)

"Summary of Findings
"From the evidence at trial, the court finds that the City originally owed plaintiff the amount of $48,171.10, as plaintiff claims. The court further finds that plaintiff was entitled to add the cost of the additional CS150 seats ($269,182.55) and the claimed sales tax of $17,493.00. The court further finds that the City is entitled to credit for the Rowley sub-contract portion of the plaintiff's bid in the amount of $245,858.00 (rather than the $300,858.00 credit claimed by the city), leaving a subtotal of $88,988.[65]. The plaintiff is entitled to interest from the date of the Judgment herein.
"The evidence does not support the plaintiff's claim for items IX through XVII, nor does the evidence support the City's claim for any credit other than the Rowley sub-contract figure mentioned hereinabove. As to plaintiff's claim for attorney fees, the evidence does not include a formal final acceptance of the construction and therefore, pursuant to R.S. 38:2191C, an award for attorney's fees is impossible even though a contract providing for attorney fees is in existence.
"Further, the court finds that the obligation of plaintiff was the `fill the area' shown on the various drawings and plans with the appropriate seating and that this contract between the City and plaintiff was not a contract on a per-seat basis. Therefore, the claim for any credit by the City on a per-seat basis is rejected.
"As findings supporting the above and foregoing conclusions, the court further finds as follows:
"1. This lawsuit arises out of the `Furnish and Install New Seating' contract, which was one (1) of five (5) general contracts comprising the Independence Stadium Phase I Renovation in 1994.
"2. The need for an immediate stadium renovation coincided with the arrival of the Shreveport Pirates of the Canadian Football League.
"3. The first preseason home game would be played on June 24, 1994 with some renovation work still in progress.
"4. The first regular season home game would be played on July 16, 1994. All stadium work was to be substantially complete on or before July 14, 1994.
. . . .
"6. On February 28, 1994, the project architect (The Newman Partnership) issued the Bidding Documents for the Seating Contract. Those documents specified that approximately 7,000 seats with arms and approximately 5,000 seats without arms would be installed. The bid documents specified that Contour Seats, Inc. Model CS200 (with arms) and CS150 (without arms) or a prior approved equal seat would be required.
"7. Those documents contained preliminary seating layouts, a description of the work and modifications to AIA (American Institute of Architects) Document A201 (`General Conditions' between the Owner and Contractor.)
"8. The February 28, 1994 preliminary seating layout in the bid package showed an approximate count of 6,989 seats with arms and 5,004 seats without arms for the East and West Stands.
. . . .
"10. Before the bid date, several addenda to the Bidding Documents were issued:
A. ADDENDUM NO. 1 (Issued March 15, 1994)
Moved the date and time of the pre-bid conference from March 17 to March 24, 1994.
B. ADDENDUM NO. 2 (Issued March 21, 1994)
(1.) Added a liquidated damages clause of [$2,000] per day and provided access to the stadium 24 *629 hours a day, 7 days per week to the contractor with nightime [sic] lighting provided.
(2.) Retained the stadium chairs with arms made by Contour Seats, Model CS200, but substituted the use of aluminum plank seating with a blue finish continuous aluminum seat back. The contractor had the option of using the old aluminum seat planks already in use at the stadium or using new planks.
(3.) Provided as follows:
`INSTALLATION'
Relocate existing bleachers as shown and attach continuous aluminum back.
Remove existing seating in areas to receive new seats along with all hardware, anchors, and other debris. Remove no more seats at one time than can be reinstalled before the next scheduled public event.
Seats shall be installed level, plumb, and secure.
Patch and refinish areas of concrete damaged, including holes left from moving of bleachers.
`RE-USE OF BLEACHER SEATING'
Bleacher seats removed but not reinstalled shall be re-used to extend the seating platforms indicated on Drawing Sheet No. 2.
`Thread-Grip' aluminum channels may be used in lieu of re-using the bleacher planks or to complete required risers if sufficient material does not exist on site. This material shall be .125" thick with 2" flange. Mounting is identical to bleacher mount. This product can be fabricated with mounting holes at 5'-0". The excess bleacher seating, at the contractor's option, may be disposed of by the contractor or stockpiled where designated for the City to claim. Manufacture: McNichols Company 1-800-237-3820 Claude Stiles or equal.
Contractors will be responsible for security of aluminum seating once he disconnects it from the stadium. Upon contractor's request, an area for his storage will be designated within 100 yards of stadium.
All Existing bleacher seats cut or modified shall have end caps installed at all aisles and molding attached where benches butt one another. All joints, edges, etc., shall be finished smooth.
C. ADDENDUM NO. 3 (Issued March 30, 1994)
Changed the bid date from March 31, 1994 at 1:00 p.m. to April 7, 1994 at 1:00 p.m.
D. ADDENDUM NO. 4 (Issued April 1, 1994)
Contained several modifications. Among them are:
 Item 2: Section 133520Stadium
 and Bleacher Seating
 Change the requirement for the `prior
 approved equal' to be the specified
 products `or equal.' No prior
 approval is required.
 Item 3: Section 13520Stadium and
 Bleacher Seating
 Add under PRODUCTS, page 1:
 Provide 1/8" aluminum end closures
 at all seats and bleachers at aisles.
 This closure panel is to be full height
 and dept [sic] of seat or bench and
 profile with edge returns. (Emphasis
 Added.)
 Item 4: Section 13520Stadium
 and BleacherSeating
 Add under INSTALLATION, page 2:
 All exposed edges of existing, new, or
 modified seats and bench seating,
 connectors, supports, or other items,
 in this contract, shall be finished
 smooth.
 Item 5: Architect will review submittals
 in stages, if requested
 by contractor, in order to
 release seats for production
 as soon as possible.
*630 "11. Addendum No. 2 is particularly significant in that it changed from installing new plastic seats without arms to reusing aluminum planks with an aluminum backrest, or at the contractor's option, new aluminum planks could be provided.
. . . .
"14. Concerns over budgeting prompted the switch in Addendum No. 2 from Contour's Model CS150 plastic seats without arms to the use of continuous aluminum seat backs attached to aluminum seat planks. This idea allowed the use of the existing aluminum planks with the expectation of a decrease in cost.
. . . .
"17. Aluminum planks removed to accommodate the CS200 plastic seats with arms could then be used to make the tread or platform extensions as shown in the construction details and typical seating layout depicted in the March 21, 1994 plans. The construction details for the tread extensions are contained in the March 21, 1994 plans. The contractor had the option to construct the tread extensions in accordance with these details or submit an alternate construction detail in a shop drawing submitted to the architect for approval.
. . . .
"20. On April 7, 1994, four contractors submitted bids to the City for the seating contract. Each bidder had received a morning telephone quote on bid day from Rowley & Company for $300,858 for aluminum seat backs. The telephone quote was confirmed by Rowley to all bidders by fax sent after bids were opened at 1:00 p.m. on April 7.
"21. Each bidder had also received Contour's quote via fax on April 6, 1994 of $253,250 for approximately 5,000 of its CS150 seats styled `OPTION AIN LIEU OF ALUMINUM PLANKS' at a per seat cost of $50.65.
"22. ... All Seasons used Rowley's quote for aluminum seat backs.
"23. The Contour Model CS150 plastic seats are considered in the seating industry to be equal to or an upgrade to aluminum plank seating with seat backs.
"24. Bids were opened by the project architect at 1:00 p.m. on April 7, 1994. All Seasons Construction, Inc. was the lowest bidder and Cochran Construction, Inc. was the second lowest bidder.

"POST-BID, PRE-AWARD

"25. The architect's duties, rights and responsibilities are defined in a written contract with the City of Shreveport.
"26. Part of the Architect's duties included conducting a pre-award investigation of the bidders on the seating contract. Separate pre-award conferences were held with All Seasons Construction, Inc. on April 7 and with Cochran Construction Co., Inc. on April 8 at the offices of the architect.

"THE CONSTRUCTION CONTRACT

"27. The construction contract between All Seasons Construction, Inc. and the City of Shreveport consists of the bid documents, all addenda to bid documents, plans, specifications, AIA/A101 form agreement, the AIA Document 201 form General Conditions, project manual and other documents as enumerated in Article 9 as well as Exhibit A of the AIA Document A101 Standard Form of Agreement Between Owner and Contractor made as of April 11, 1994.
"28. The Contractor is shown as All Seasons Construction and Roofing, Inc. on page 1 and again on page 8 of the AIA Document 101.
"29. Edward L. Angel signed that document as President of All Seasons Construction and Roofing, Inc. without qualification or protest as to corporate identity.
. . . .
"31. After learning that another low bidder would be interviewed before the contract was awarded, Terry Moore with *631 All Seasons, suggested to Mike Newman in a telephone call at about 5:30 p.m. on April 7 that there may be a way to obtain all plastic seats instead of the aluminum seat backs and give the City a credit of $30,000 to $35,000. This telephone call occurred after the pre-award conference was held with All Seasons and before the pre-award conference was held with Cochran Construction Co.
"32. Mike Newman requested that Terry Moore pursue the change of the type of stadium seats and requested that Moore provide the necessary documentation for a change order.
"33. On Friday morning of April 8, Terry Moore told John Carlisle at the offices of The Newman Partnership that the substitution of the plastic seats would be a `no cost' change.
"34. Over the weekend (April 9 and 10) Terry Moore and Ed Angel told Mike Newman it would be a $10,000 credit, then `a wash', then later a $30,000 additional cost.
"35. All Seasons did not submit the routine and ordinary documentation in support of a contract change order as requested by the architect on April 7.
"36. By April 15, All Seasons still had not submitted a proposed change order with appropriate documentation, despite repeated requests by the architect.
"37. Part of the project architect's duties also included evaluating changes in the work after the contract was awarded. The Change Order process may be summarized as follows:
A. `Minor changes,' those with no added cost and no added time, can be approved by the project architect.
B. Generally, `Major changes' to the work involve added cost or added time.
C. A contractor may propose a Change Order at any time during the course of the project. The contractor may propose a Change Order on his own initiative or at the request of the architect or owner.
D. A `Change order' is a major item requiring the Owner's approval.
E. A `Construction Change Directive' is a written order prepared by the Architect and signed by the Owner and Architect, directing a change in the Work and stating a proposed basis for adjustment, if any, in the Contract Sum, or Contract Time, or both.
"38. For public work contracts LSA R.S. 38:2212 provides language pertaining to Change Orders, in pertinent part as follows:
. .(4) All public work contracts shall contain provisions authorizing the issuance of change orders within the scope of the contract.
. .(5) All change orders shall be in writing.
... (7) Any change order pertaining to public work, not required by this Part to be put out for public bid, shall either be negotiated in the best interest of the public entity or let out for public bid as provided by this Part. Where the change order is negotiated, the public entity shall require that said change order be fully documented and itemized as to costs, including material quantities, material costs, taxes, insurance, employee benefits, other related costs, profit and overhead. Where certain unit prices are contained in the initial contract, no deviations shall be allowed in computing negotiated change order costs.
. . . .
"40. In a conference on April 14, with Newton Bruce (the Chief Administration Officer for the City of Shreveport), Lydia Rhodes (an Assistant City Attorney) and Mike Newman, the possible use of a Construction Change Directive (`CCD') was discussed.
"41. At that April 14 meeting, Newton Bruce, as Chief Administrative Officer *632 and the contractually designated representative for the City directed the project architect to issue a Construction Change Directive substituting `Stadium Chairs without arms as manufactured by Contour Seats, Inc., Model CS150.'
"42. The CCD was signed by the City and the Architect and issued on April 15, 1994. It directed All Seasons Construction and Roofing, Inc. to make specified changes in the contract.
"43. The Construction Change Directive directs the Contractor to make changes in the Work, which, if not implemented expeditiously, might delay the project.
"44. In a contrast to a Change Order, a Construction Change Directive (AIA Document G 714) is used where the Owner and Contractor, for whatever reason, have not reached agreement upon the proposed changes in the Contract Sum or Contract Time. Upon receipt of a signed Construction Change Directive, the Contractor must promptly proceed with the change described.
"45. The Construction Change Directive was issued in this project on a standard form, AIA Document G 714.
"46. Edward L. Angel, President of All Seasons, never transmitted a signed copy of the CCD to the City or to the architect; however, Mr. Angel transmitted to Contour Seats, Inc. a copy of the CCD which bears his personal signature as the contractor but no date.
"47. In the signature block on the CCD, there is the following language:
`Signature by the Contractor indicates the Contractor's agreement with the proposed adjustments in the Contract Sum and Contract Time set forth in this Construction Change Directive.'
"48. Mr. Angel's signature on the CCD binds All Seasons to the proposed adjustments and methods in adjusting the Contract Sum and/or the Contract Time.
"49. The CCD specified a proposed basis of adjustment to the contract price as provided in Sec. 7.3.6 of AIA Doc. A201, 1987 Edition as modified by the project manual. The proposed Contract Time remained unchanged.
"50. Section 7.3.6 of AIA Document A201 requires the contractor to keep and present to the architect an itemized accounting and supporting data for adjustments to the Contract Sum.
"51. Contour Seats was already the supplier of approximately 7,000 Model CS200 seats with arms, and their CS150 price quote per seat was coordinated with their quoted unit price per seat of Model CS150.
. . . .
"53. The original bid of All Seasons Construction, Inc. was $983,960 and contained an amount of $245,858 for aluminum seat backs, as testified to by personnel for plaintiff, which testimony was corroborated by Chris Christensen.
"54. Mike Newman requested that Ed Angel of All Seasons Construction submit All Seasons' bid figuring sheet or bid work-up sheet to document the cost of the aluminum seatbacks included in the bid. Mr. Angel refused to supply that document, claiming that it was `proprietary.' All Seasons later claimed that their bid work-up sheet had been `lost.'
"55. The construction contract required All Seasons to furnish a full-time qualified field superintendent, and Charles `Chuck' Morris was hired by All Seasons as their field superintendent.
"56. On April 22, 1994, Terry Moore submitted to the architect via fax the first of several proposals for a change order in connection with the CCD.
"57. No attachments or other required substantiating documents were submitted for review with that April 22 proposal.
. . . .
"60. On April 22, All Seasons claimed that added net cost of the Construction *633 Change Directive was $95,822.65, even though Contour had not yet supplied or installed the CS150 seats.
"61. When the issue of additional sales tax was first addressed by the City, the architects agreed with plaintiff that additional sales tax was due and should be granted to plaintiff. [Indeed, Mike Newman recommended the $17,493.00 figure.]
"62. The proposals submitted by All Seasons did not contain the required documents or on-the-job back-up information required by the contract to be submitted and evaluated by the architect.
"63. All Seasons was required by contract and by law to have its subcontractors properly licensed under Louisiana law.
"64. Contour Seats originally served as a subcontractor to All Seasons for installation of all seats, Models CS200 and CS150; however, Contour did not hold a Louisiana contractors license and work stopped until arrangements could be made to substitute Dailey Construction Company. The delay is attributable to All Seasons.
"65. The only approved change order totalling $19,337 contained an acceleration charge made to All Seasons by Dailey Seating of $6,000 plus a $2,100 labor burden to All Seasons.
"66. Contour's quote[s] ... excluded sales tax....
"67. All Seasons claims $12,351.60 (`more or less') for `additional labor, supervision and overhead burden' for stockpiling unused aluminum bench seats due to the CCD.
"68. As per the Contract, these planks belonged to All Seasons after they were removed. This claim by plaintiff is not supported by the evidence and is therefore rejected.
"69. As to the claim for additional supervision, the contract required All Seasons to provide a full time supervisor, there is therefore no basis to charge for additional supervision. Additionally, Charles `Chuck' Morris was a monthly, salaried employee of All Seasons; he did not keep records of the time he spent each day at the job site and did not keep separate payroll records on his crew for claimed CCD extras. All Seasons payroll records did not show any additional time spent by Morris beyond a 40 hour week.
"70. The Bidding Documents clearly show new aisles being cut in the stands with the requirement to `reuse cap from aluminum bleacher to finish end of bleacher where new aisle is installed.'
"71. Four new vertical aisles are shown clearly in the West Stands. Addendum No. 2 contained a detailed seating layout as of March 21, 1994.
"72. The placement of new aisles in the stands is clearly depicted on scaled drawings.
"73. Addendum No. 4 (issued April 1) required that the end caps and exposed edges shall be finished smooth.
"74. Each of these documents were issued and reviewed by All Seasons before they submitted their original bid. All Seasons acknowledged the addendums on their bid form, and the addendums are listed individually in the Owner/Contractor Agreement.
"75. All Seasons' claim for $7,258 for additional labor and overhead for demolition and tread extensions as a result of the CCD is not supported by the evidence and that claim is rejected.
"76. All Seasons claims $12,701 extra for `unspecified steel fabrication' and `additional installation.' No steel is required or affected by the CCD. Contour has its own components for seat installation and supports. All Seasons has never submitted any documentation for this `miscellaneous item.' This claim is not supported by the evidence and is therefore rejected.
"77. All Seasons submitted a shop drawing that resulted in a credit to the City on some steel fabrication items which are accounted for in the only approved change order.
*634 "78. All Seasons claims $2,025 for `additional field supervision.' Full-time, on-site supervision was required by the contract documents. Job records showed no more than 40 hours per week were worked by Charles Morris as the full-time, on-site field superintendent. Further, All Seasons did not pay any overtime or more money to its field superintendent, Chuck Morris, than his regular monthly salary during the course of the project, from April 11 to July 14, the date of substantial completion, thus there is no additional amount due All Seasons by the City.
"79. With respect to the claim for $3,139.12 for field bleachers, the cost of this item was included in All Seasons' original bid and was never affected by the Construction Change Directive.
"80. All Seasons claims an additional bond premium of $1,272.57 due to the CCD; however, a flat bond premium of $8,652 was paid by All Seasons to Keith D. Peterson Insurance Agency on June 23, 1994 after the CCD was issued. The bond had effective dates of April 12, 1994 to April 12, 1996. No further billing was submitted by the bond agent and no further payment was made by All Seasons. All Seasons is not entitled to any additional bond premium.
"81. Pursuant to La. R.S. 38:2191, no attorneys fees are due since All Seasons has not completed its work and no final, formal acceptance has been issued. Diamond B. Const. Co., Inc. v. City of Plaquemine, 673 So.2d 636, # 95-1979 (La.App. 1st Cir.4/30/96). Such a requirement is not subject to waiver by contract. R.S. 38:2191C.

"CONCLUSION

"For the above and foregoing reasons, there should be judgment in favor of plaintiff against the City of Shreveport in the full sum and amount of Eighty-Eight Thousand, Nine Hundred and Eighty-Eight and 65/100 Dollars ($88,988.65), together with interest from the date of final judgment in this case. All other claims of plaintiff are rejected and all other claims of the City are rejected. Costs of court are cast against the City of Shreveport. Judgment is to be prepared in accordance with these findings and submitted to the undersigned for signature."
[Emphasis in original. Footnotes omitted.]

Additional Discussion
In its first assignment of error, the City challenges the trial court's decision to issue a credit of only $245,858 for the Rowley Company's seating contract. As detailed in the trial court's reasons for judgment, the City believed that it should receive a credit for the amount of the bid which Rowley submitted to all the contractors interested in the Independence Stadium project, i.e., $300,858. As proof that the lower sum had been negotiated before submitting its project bid to the owner, All Seasons offered the testimony of several witnesses, including representatives of both All Seasons and Rowley. The original subcontract between these two entities (signed after the general contract had been awarded to All Seasons) was not produced, as only copies could be located by either company. Thus, the City argues, any testimony regarding the agreement should have been disallowed and the court should have employed an adverse presumption that the original contract would not have supported the solicited testimony. Inasmuch as All Seasons also could not produce their scope sheets (showing the figures used in calculating its bid), the City urges a similar argument in an effort to have the testimony regarding that issue excluded as well.
Where a party fails to produce evidence available to him, the presumption is that the evidence would have been unfavorable to him. Morehead v. Ford Motor Co., 29,399 (La.App.2d Cir.05/21/97), 694 So.2d 650, writ denied, 97-1865 (La.11/07/97), 703 So.2d 1265; Small v. Baloise Ins. Co., 96-2484 (La.App. 4th *635 Cir.03/18/98), ___ So.2d ___, 1998 WL 138826, writ denied, 98-1345 (La.07/02/98), 724 So.2d 733; see also La. C.E. art. 1004(1) and Evans v. Graves Pontiac, 576 So.2d 1025 (La.App. 1st Cir.1991), writ denied, 581 So.2d 687 (La.1991). However, the presumption of spoliation of evidence does not apply when a reasonable explanation exists for the failure to produce the evidence. Id. Nor is it error for the trial court to exclude testimony related to a document which remains inexplicably unproduced. See Patterson v. Meyers, 583 So.2d 79 (La.App. 4th Cir.1991).
In the instant matter, the trial court allowed testimony regarding the subcontract between All Seasons and Rowley and, indeed, found that testimony to be credible. An original contract could not be located by either All Seasons or Rowley. Yet, All Seasons produced a copy of the subcontract (P8) which confirmed the price it had claimed to use. Clearly, the judge detected neither bad faith nor a conspiracy to keep the document from the City and its representatives. We find no error in that conclusion nor in the trial judge's credibility call that All Seasons, had, indeed, procured the lower price quote in time to include it within the bid submitted to the City.
Next, the City challenges any reliance, whatsoever, on the subcontract, arguing that contract had been voided in another lawsuit, in part, at All Seasons's insistence. Yet, examination of the reasons for judgment in that suit, Rowley Co. v. All Seasons, et al, 1st Judicial District Court number 400,064, reveals that the contract had not been invalidated. Instead, the court had determined that Rowley would not have been able to perform timely under the subcontract at issue and, thus, could not prove its claim for lost profits. Furthermore, the reasons therein reveal that All Seasons had stipulated to the existence, correctness, and validity of the contract it had with Rowley. Contrary to the City's assertions, the Rowley judgment does not preclude All Seasons's current position under a theory of res judicata. See La. R.S. 13:4231. Nor does the contractor's stance constitute a collateral attack on that judgment.
In its second assignment of error, the City argues that there was insufficient evidence to support the court's award to All Seasons of an additional $23,324.55 for the change in seating and $17,493 for sales taxes. Finally, in its third assignment of error, the City argues that the trial court erred both in not granting its various credits and offsets and in awarding the balance due under the original contract inasmuch as the work allegedly has not been completed. Also, in its own appeal, All Seasons assigns as error some eleven additional claims for payment. These issues all concern factual calls made on the contested charges in the contract, the construction change directive, and post-construction claims. Such rulings are subject to review under the manifest error rule. In that regard, a court of appeal may not set aside a trial court's finding of fact unless it is clearly wrong. Stobart v. State, DOTD, 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989). The task of a reviewing court is not to assess whether the district court's factual findings are right or wrong in an absolute sense, but to ask whether the fact finder's resolution of conflicting evidence was reasonable, in light of the record as a whole. Mistich v. Volkswagen of Germany, Inc., 95-0939 (La.01/29/96), 666 So.2d 1073. So long as a fact finder's conclusions are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse even if convinced that, had it been sitting as the trier of fact, it would have weighed the evidence differently. Holt v. Aetna Cas. & Sur. Co., 28,450 (La.App.2d Cir.09/03/96), 680 So.2d 117, writs denied, 96-2515, 96-2523 (La.12/06/96), 684 So.2d 937, 938.
Inasmuch as the lower court has extensively considered each claim by the parties[1] *636 and we find no manifest error in those rulings, the reasons propounded by the lower court, and adopted here on appeal, require no further elaboration.

Conclusion
Accordingly, for the foregoing reasons, the judgment below is affirmed. Costs are assessed equally between the parties.
AFFIRMED.

APPLICATION FOR REHEARING
Before WILLIAMS, STEWART, CARAWAY, KOSTELKA, and DREW, JJ.
Rehearing Denied.
NOTES
[1] Although the court did not include the specific, numeric details regarding a few of the claims made, its reasons encompass those claims nonetheless. Particularly, we note that the trial court concluded that "[t]he proposals submitted by All Seasons did not contain the required documents or on-the-job back-up information required by the contract to be submitted and evaluated by the architect." As to the claims lodged by the City, we agree with the trial court's ruling as to the untimeliness of the reconventional demands. Furthermore, the record does not reveal a clear wrongness in the ultimate rejection of those claims.