923 So.2d 852 (2006)
The NEWMAN MARCHIVE PARTNERSHIP, INC., Plaintiff-Appellee
v.
CITY OF SHREVEPORT, Defendant-Appellant.
No. 40,512-CA.
Court of Appeal of Louisiana, Second Circuit.
February 24, 2006.
Rehearing Denied April 5, 2006.
*854 Weems, Schimpf, Gilsoul, Haines & Carmouche by Brian D. Landry, Carey Schimpf, Kenneth P. Haines, Shreveport, for Appellant.
Mayer, Smith & Roberts by Caldwell Roberts, Wiener, Weiss & Madison by John M. Madison, Jr., M. Allyn Stroud, Shreveport, for Appellee.
Before BROWN, PEATROSS, and LOLLEY, JJ.
BROWN, C.J.
This litigation arises out of a February 18, 1994, contract that the City of Shreveport entered into with an architectural firm for renovations to Independence Stadium. The project spanned three mayoral administrations and was to be done in three phases. The first phase was designed to accommodate the needs of the Shreveport Pirates, a Canadian Football League team, and was completed by July 1994. In 1999, the new administration of Mayor Keith Hightower determined that the work of the architectural firm was completed. The architectural firm sued the City of Shreveport on an open account claiming an unpaid balance of $248,394.51 on its $1,208,097.86 fee, termination expenses of 10% of the total compensation owed ($120,809), and loss of anticipated profits on future projects of $587,000.[1] The City filed a reconventional demand against the firm and its president; however, this claim was dismissed on an exception of prescription.
A jury awarded the architectural firm $251,304.34. Although the jury verdict did not provide a specific breakdown of the award, plaintiff asserts that the jury award was only for the open account claim. Both defendant and plaintiff have appealed. For the reasons set forth below, we amend in part and, as amended, affirm.

Facts and Procedural Background
On February 18, 1994, the City of Shreveport ("the City"), through its then mayor, Hazel Beard, and the Newman Partnership, Inc. (hereinafter referred to as the "Newman Partnership") entered into a contract for renovations to the Independence Stadium in Shreveport. Although the work was to be accomplished in three phases over the course of several years, it was considered to be one project. The initial phase had a short time frame, until July 1994, in which the stadium would be readied to accommodate the Shreveport Pirates, a Canadian Football League team. Canadian football is played on a larger field than its American counterpart and changes to the existing stadium structure were necessary to widen the playing surface.
Through the administrations of Mayors Hazel Beard and Robert "Bo" Williams, 1994-1999, the Newman Partnership provided architectural services to the City on various stadium projects under the 1994 contract. Toward the end of Mayor Williams' administration, the Newman Partnership was told to proceed with a project to repaint the stadium. Work commenced on the basic phase of the painting project prior to Mayor Keith Hightower taking office.
In the early months of the first term of Mayor Hightower, the City and the Newman Partnership maintained a good working relationship. However, in the summer of 1999, the City's Chief Administrative Officer ("CAO") Ken Antee became concerned with the necessity of the architectural cost associated with the painting *855 project. The Newman Partnership's president, Mike Newman, took notes and memorialized a September 1, 1999 meeting as follows: "Mr. Antee indicated that the scope of work for the '94 project was already completed and that the current work was part of a piece by piece extension that really did not comply ... Mr. Antee restated that this was a maintenance project and just does not need an architect;" and "Mike (Newman) stated that if the City did not want us involved with the project that we would just as soon not be involved and we don't want to continue." Thus, the Newman Partnership's work under the 1994 contract ended on September 1, 1999. The City paid the Newman Partnership for phase one of the painting project but not for the final two phases or for reimbursable expenses paid by the Newman Partnership to the company which provided air monitoring services at the stadium.
The Newman Partnership filed a petition on an open account against the City on February 11, 2002, seeking an unpaid balance of $248,394.51.[2] The City answered and asserted a reconventional demand against the Newman Partnership as well as a third party claim against its president, Michael Newman. Thereafter, the Newman Partnership filed a first and second amended and supplemental petition seeking termination expenses in the amount of $50,816.90 and lost profits in the amount of $1,142,607.51, and reasserting its claim for $248,394.51. The City answered with a general denial. At trial, and without amending its petition, the Newman Partnership claimed termination expenses of $120,809 which represented 10% of the total compensation claimed.
On the first day of the trial, which began on July 12, 2004, and continued through July 16, 2004, Newman and the Newman Partnership filed an exception of prescription to the City's reconventional demand. This exception was granted and the reconventional demand was dismissed by judgment rendered on July 15, 2004.
The jury found that the Newman Partnership was due remuneration from the City "either under contract or value of services" and, "after considering the claims of both parties," determined that the City owed the Newman Partnership the amount of $251,304.34. The verdict form did not provide a specific breakdown and the jury did not itemize its award. Furthermore, as noted by both parties, the amount awarded by the jury, $251,304.34, does not match up with any combination of the specific amounts sought by the Newman Partnership.

Discussion
The City has assigned seven errors, each addressing a specific aspect of the particular amounts sought by and [apparently] awarded to the Newman Partnership, to wit, (1) fee for work on a Master Plan; (2) percentage fee on judgment in favor of All Seasons Construction which increased the contractor's claim; (3) fee for a field turf project; (4) compensation for painting project; and, (5) reimbursement at cost plus 5% for air monitoring on the painting project. In its answer, the Newman Partnership raised an assignment of error related to the sufficiency of the jury's award, i.e., that the jury erred in failing to award termination expenses. At oral argument, plaintiff's counsel announced the Newman Partnership's intention to abandon its assignment of error *856 relating to the jury's failure to award lost profits and attorney fees. In its final assignment of error, the Newman Partnership asserts that the trial court improperly denied its request for judicial interest on the judgment.

Applicable Legal Principles
A contract is an agreement by two or more parties whereby obligations are created, modified or extinguished. La. C.C. art. 1906. Legal agreements have the effect of law upon the parties, La. C.C. art. 1983. A contract is the law between the parties and courts are bound to give legal effect to all such contracts according to the true intent of the parties. La. C.C. art. 2045; Pendleton v. Shell Oil Company, 408 So.2d 1341 (La.1982); Moseley v. Mustin, 38,455 (La.App. 2d Cir.07/28/04), 880 So.2d 105. Obligations of the parties to a contract are fixed at the time the contract is entered into. Louisiana Smoked Products, Inc. v. Savoie's Sausage & Food Products, Inc., 96-1716, 96-1727 (La.07/01/97), 696 So.2d 1373. Contracts, like all other obligations, must be performed in good faith. La. C.C. art. 1908.
When factual findings are pertinent to the interpretation of a contract, these determinations are not to be disturbed by a reviewing court in the absence of manifest error. Mount Mariah Baptist Church, Inc. v. Pannell's Associated Electric, Inc., 36,361 (La.App. 2d Cir.12/20/02), 835 So.2d 880, writ denied, 03-0555 (La.05/02/03), 842 So.2d 1101. Where there is conflict in the testimony, the trier of fact's reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. Rosell v. ESCO, 549 So.2d 840 (La.1989). Where two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Id.

The 1994 Contract
The 1994 Contract entered into by the parties is a standard American Institute of Architects ("AIA") form. The contract sets forth the architect's responsibilities and the scope of the architect's "Basic Services," which include the schematic design, design development, construction documents, bidding or negotiation, and construction or administration of the construction contract.
The basis of compensation is set forth as a percentage of the construction cost which is calculated using the State Fee Formula for Renovations. Compensation for additional services is set by an attached hourly schedule and reimbursable expenses at cost plus a 5% mark-up.

Work on Master Plan
Section 1.6.1 of the Addendum to the 1994 contract provides as follows:
Develop[ment of] a Master Plan and aesthetic design for the entire stadium area. This plan is to guide the development of future phases of work and consider such things as street and road locations, space around the stadium, landscaping, Americans with Disabilities Act Accessibility Guidelines, and aesthetic design.
There is no ambiguity in this section of the contract. The Newman Partnership was to produce a Master Plan to guide the development of the three phases of the work taking into consideration such things as the street and road locations, space around the stadium, landscaping, ADA accessibility guidelines and aesthetics.
Newman testified that he and Newton Bruce, the CAO for Mayor Beard, agreed on a $35,000 fee for the Newman Partnership to write a Master Plan. Newman testified that this figure was an estimate as he had no real basis for setting the sum. Newman further testified that this specific *857 figure was written into the 1994 contract. Contrary to Newman's testimony, however, the 1994 contract did not specify any fee prompting the City's argument that it was covered in Basic Services. Newman further testified that an increase of this initial fee to $50,000 was later agreed to by Wendell Collins, the CAO for Mayor Williams. We note that both Mayor Beard and Wendell Collins testified in this trial and neither supported Newman's testimony about either the initial fee or the increase.
Newman prepared a list of work for phase one of the project. Primarily, this enumeration included the expansion of the size of the playing field, which required demolition and rebuilding of part of the stadium. Listed as a part of phase one was the Master Plan. Newman testified that phase one was completed in 1994 on time and that he was paid the agreed-to percentage of the construction cost. That fee was $707,000. In March 1995, the Newman Partnership sent an invoice to Mayor Williams for 30% completion of the Master Plan. The invoice stated that 30% of $35,000 was $10,500. The City paid this bill. On May 20, 1998, the Newman Partnership submitted a bill to Mayor Williams for $22,750 for the Master Plan. This invoice stated that the Master Plan was 95% complete. The last 5% would amount to $1,750. In a letter accompanying the invoice, Newman wrote, "In our meeting with Mr Collins last week, I again stated that our total fee for the Master Plan was $50,000 ... However, in reviewing the written documentation, I can only find a $35,000 fee amount. (We again note that no such written documentation existed). Therefore, I am basing this billing on a total fee for the Master Plan for Independence Stadium of $35,000 ... Attached is an invoice for our current progress payment (95%)." The City paid the bill up to the "current progress." The total paid at that point was $33,250. The next day, May 21, 1998, the Newman Partnership submitted to the City an "Advance Copy" of the Master Plan. Without further editing, this advance copy was accepted as the Master Plan.
According to the City, the Newman Partnership was fully compensated for its work on the Master Plan through fees it collected under "Basic Services" of the 1994 contract which exceeded $1 million and thus was overpaid $33,250. Alternatively, if a fee is still due, the City argues that the Newman Partnership did not establish entitlement to an additional $16,750 (to bring the total fee to $50,00), but rather to the lesser amount of $1,750 which represents the final 5% of the $35,000 billed.
Whether the Newman Partnership and the City agreed that this Master Plan would or would not be included in the Basic Services under the 1994 contract is no longer at issue. The City, under Mayor Williams, twice accepted Newman's statements and paid both invoices. We agree, however, with the City that the Newman Partnership offered no corroborating evidence that an increase in the contract to $50,000 was agreed upon by the parties. As shown in Newman's letter accompanying the invoice, the Newman Partnership's total bill was $35,000 for the Master Plan. CAO Collins was presented as witness by the Newman Partnership and was not questioned about the existence of an agreement to increase the alleged Master Plan fee to $50,000.
The jury's verdict did not specify whether its calculations included a sum for this Master Plan. If it awarded a sum representing $50,000 for the Master Plan, it was clearly wrong. We find that on this claim, the Newman Partnership is only entitled to an additional $1,750.

*858 Percentage Fee on Judgment in Favor of All Seasons Construction

The Newman Partnership designed the plans and specifications for the modifications to the bleachers and seating. All Seasons Construction submitted a bid and was hired by the City to install chair style seating in the central sections of the stadium.
At the completion of the project, All Seasons had been paid $1,003,297 by the City. In accordance with the 1994 contract, the Newman Partnership was paid an architect's fee of $153,573. Thereafter, All Seasons filed suit against the City and the trial court awarded All Seasons an additional $88,988.65, which was affirmed by this court. See All Seasons Construction, Inc. v. The City of Shreveport, 32,190 (La. App. 2d Cir.08/18/99), 742 So.2d 626, writ denied, 99-3052 (La.12/17/99), 752 So.2d 168. Thus, the total amount paid to All Seasons was $1,092,285. We note that the Newman Partnership testified for the City against All Seasons and was paid an expert witness fee of $36,436.
Based on the increase in the construction costs associated with the seating project, plaintiff asserts entitlement to an additional $12,920.22 in architectural fees. The City contends that the Newman Partnership failed to prove its entitlement to any further fee because the only evidence introduced at trial to support the claim was the judgment in favor of All Seasons, the testimony of Michael Newman, and an invoice from plaintiff seeking a percentage fee of the amount of the judgment in favor of All Seasons. Clearly, this is sufficient evidence from which the jury could have concluded that the construction costs associated with the work done by All Seasons totaled $1,092,285.00 as asserted by plaintiff and that the total architectural fee due under the 1994 contract for this project was $166,493.22. Having received $153,573.00, plaintiff is entitled to an additional $12,920.22.

Fee for Field Turf Project
The playing surface of Independence Stadium was grass. In 1999, after Mayor Hightower took office, CAO Antee approached Michael Newman to look into changing the playing field to an artificial surface. Newman stated that he spoke with several suppliers and accompanied Antee on a trip to Amarillo to examine a field which had an artificial turf surface. Newman also testified about conversations he had with officials from the NCAA, as well as various soccer and football associations to learn all about field turf. During the process he found out that the City used Independence Stadium more than most facilities its size and caliber which increases the impact on the field playing surface.
Although the Newman Partnership was scheduled to begin work on the drawings for this project, it was placed on hold because the field turf contractor would not meet the bid commitment. It was at that point that plaintiff decided to bill for work on this project at an hourly rate, claiming that compensation was proper under the "Additional Services" section of the 1994 Contract. According to Newman, when the initial contractor couldn't meet the contractual commitments, Antee instructed him to put the project on hold. Newman stated that he sent the City a detailed bill in the amount of $2,367.50, but he never received payment. After the Newman Partnership's contract was terminated, the City installed an artificial playing surface. Had the Newman Partnership billed the City based on the construction cost that was ultimately incurred on this project, plaintiff's fee would have been $25,000-$30,000. We cannot say that the amount sought by the Newman Partnership, $2,367.50, is improper. The field *859 turf project was an addition to the contract, and the amount charged was reasonable and represented time spent.

Compensation for Painting Project
Phase Two called for the removal of paint and the repainting of structural steel at the stadium. At one point during Mayor Williams' term, the City had considered using their own employees and doing the work as a maintenance project; however, the City's Risk Manager, Tom Cody, felt that the height and complexity of the stadium structure was beyond what city workers were equipped to handle, and he was concerned about their involvement with hazardous materials (the paint to be removed was lead-based). In light of these concerns, the City decided to do the painting work as a capital improvements project. On June 30, 1998, representatives from Mayor Williams' office and the Newman Partnership met to discuss the painting project.
Michael Newman testified that this project had been discussed since the contract was executed in 1994, and was to be completed before the 1998 Independence Bowl with a budget of $1.5 million. It was the Newman Partnership's job to get the plans and specifications done so the City could bid the project out and have the work done. The painting project was to be done in stages; a base bid plus several add alternates. The base bid covered the east end of the stadium; alternate # 1 addressed the light standards; alternate # 2 covered the west end; and alternate # 3 dealt with the north end. Although only the base bid project was to be done initially, the Newman Partnership drafted plans and specifications for the entire stadium and bids were received for all aspects of the project.
Plaintiff based its early invoices to the City on a percentage of the removal and painting costs as provided in the "Basic Services" section of the contract. As shown in the May 22, 2000, invoice, using $1,092,734 as the construction cost for the base bid, the Newman Partnership's fee up to that time was $96,700.89. As of the time that this suit was filed, the City had paid all but $30,279.59 of this amount.
Once the City ended its contractual relationship with plaintiff, Martin Specialty Coatings finished the work under the base bid and painted the areas provided for in alternates # 2 and # 3. Martin Specialty followed the plans and specs prepared by the Newman Partnership.
The 1994 Contract provides that whenever the Newman Partnership's plans are used in any work undertaken at Independence Stadium, the firm is entitled to a percentage fee based upon the project cost. According to Newman, this is a standard provision contained in most architectural contracts. Although the need for an architect for this painting project was questioned by both the Williams and Hightower administrations, Mayor Williams' CAO made a decision to use the services of an architect and to do so under the 1994 Contract. Therefore, plaintiff was entitled to a percentage fee for design work done in conjunction with the painting project. The sum to be awarded is the amount sought, $184,496.85. ($30,279.59, balance on base bid, plus $154,217.26, amount due on alternates # 2 and # 3).

Reimbursement for Payments to PSI
The Newman Partnership sought reimbursement of the amount it paid to the firm that initially provided air monitoring services during the painting project. The amount which included the Newman Partnership's 5% markup was $62,139.53. At trial, the City explained its refusal to reimburse plaintiff for payments made to Professional Services Industries, Inc. ("PSI"), as follows. The fees paid by *860 plaintiff to PSI were inappropriately calculated and excessive, particularly when compared to the proposals submitted by the other bidders. According to defendant, the only motivation behind plaintiff's choice of PSI, who was not the lowest bidder, was financial gain; by choosing PSI, the Newman Partnership increased its own fee proportionately, since it would receive a 5% add-on to the amount charged by PSI.
Michael Newman testified that his firm's work on the painting project included making sure that the project was in compliance with applicable laws and regulations, such as the Clean Air Act, Clean Water Act, and OSHA and DEQ regulations. As the project architect, the Newman Partnership was responsible for advising the City of the applicable standards and potential liabilities. It also had to arrange for the containment of contaminated materials, get the proper permits, and arrange for disposal. To determine whether the various protective measures were working, two methods of air monitoring were to be utilized.
Before the painting work began, the City had a ball park estimate of the cost of the entire project, including the environmental monitoring. The City authorized Newman to hire a third party to conduct monitoring at the stadium. Proposals from several companies were submitted and on Newman's recommendation, the City approved PSI.
The scope of PSI's duties included setting up monitors and controls on site, making sure applicable standards and regulations were met, running air monitor filters, keeping containments intact, sampling, compiling reports, insuring that there was no debris on site, and checking to be sure that Martin Specialty was following proper procedures. Michael Newman testified that environmental techs from the Newman Partnership served as management over PSI's on site employees. PSI provided the on site equipment and manpower, but the analytical work was done off site by EMSL Analytical, Inc.
Newman stated that during the project, PSI billed the Newman Partnership for air monitoring services at the stadium and the Newman Partnership paid PSI. The City was to reimburse the Newman Partnership plus a 5% mark-up. According to Newman, PSI was taken off the painting job the same time that the Newman Partnership was, which was around the first of September 1999. Newman stated that the amount owed by the City is $62,139.53.
Plaintiff has established its entitlement to the amount sought and this figure will be included in our calculation of the total amount owed by the City.

Termination Expenses
In its answer, plaintiff asserted that the jury erred in failing to award termination expenses in the amount of $120,809. Given the amount of its award, the jury clearly found no merit to the Newman Partnership's claim for termination expenses. Michael Newman testified that at the time the Newman Partnership was terminated, construction at the stadium was 18% complete; however, he reached this percentage by inclusion of a later $27 million project to expand the south end zone which was not part of the 1994 contract. The Newman Partnership had no involvement with the south end zone construction which represented the Newman Partnership's abandoned lost profit claim. Newman then stated that the total compensation owed to the Newman Partnership was $1,208,097 (which was only for work through the painting project); multiplying this figure by 10%, the total termination expenses allegedly due were $120,809.
*861 The jury obviously rejected the Newman Partnership's claim for termination expenses. A reasonable interpretation of the evidence is that the work of the architect was completed. The Newman Partnership did prepare and present plans for the entire painting project. The jury awarded a percentage of construction costs as the fee for this work, which award we have affirmed. We cannot say that the jury was clearly wrong.

Judicial Interest
The Newman Partnership argues that the trial court erred in failing to award legal interest on the judgment from the date of judicial demand or from the date of judgment. On the other hand, the City points to the provision in the parties' contract whereby plaintiff agreed to "[o]mit the requirement for the City to pay interest on overdue accounts" and urges that the trial court, by denying interest on the judgment, was simply giving effect to the parties' intent as evidenced by their agreement.
Louisiana Code of Civil Procedure article 1921 provides that the court shall award interest in the judgment as prayed for or as provided by law. Louisiana Civil Code article 2000 provides, in pertinent part, that when the object of the performance is a sum of money, damages for delay in performance are measured by the interest on that sum from the time it is due, at the rate agreed by the parties, or in the absence of agreement, at the rate of legal interest as fixed by R.S. 9:3500.
Interest fixed by agreement is called conventional interest, while interest fixed by law is called legal interest. La. R.S. 9:3500(A). When legal interest is awarded by a court as a result of judicial demand it is called judicial interest. La. R.S. 9:3500(B)(1). 6 Saul Litvinoff, Louisiana Civil Law Treatise: Obligations, Putting in Default and Damages, § 9.4 (1999).
We do not read the parties' contractual waiver of conventional interest on overdue accounts as anything more than that. Clearly, the Newman Partnership and the City contemplated situations in which invoices would be sent by plaintiff and on occasion, not so promptly paid by defendant. Having agreed that the City's overdue accounts would bear no conventional (or legal) interest, however, the Newman Partnership did not express its intent to waive legal or judicial interest once it filed suit, an event which served to put the City in default. See La. C.C. art. 1989.[3] As held by the supreme court in Alexander v. Burroughs Corporation, 359 So.2d 607 (La. 1978), a debt or claim for the payment of money or damages under a contract is ascertainable and becomes due on the date an active violation occurred or the date the obligor was put in default, which can be earlier but never later than judicial demand, and legal interest runs from that date. See also Mini Togs Products, Inc. v. Wallace, 513 So.2d 867 (La.App. 2d Cir. 1987), writs denied, 515 So.2d 447, 451 (La.1987).
As noted above, interest are damages due for delay in the performance of an obligation. See La. C.C. art. 2000. By agreement, the parties decided that interest would not run while the City had sums outstanding on overdue accounts. Once the Newman Partnership filed suit, however, these overdue accounts became the object of judicial demand to which legal interest *862 attached in accordance with La. C.C.P. art. 1921 and La. R.S. 9:3500. The trial court erred in finding otherwise.

Conclusion
For the reasons set forth above, the judgment of the trial court is amended as follows. Plaintiff, the Newman Marchive Partnership, Inc., is hereby awarded the sum of $263,674.10, together with legal interest thereon from the date of judicial demand. Costs of this appeal are assessed one-half to Newman Marchive Partnership and one-half as allowed by law to the City of Shreveport. Amended and, as Amended, Affirmed.
APPLICATION FOR REHEARING
Before BROWN, STEWART, PEATROSS, MOORE, and LOLLEY, JJ.
Rehearing denied.
NOTES
[1] These sums for termination expenses and lost profits are what plaintiff claims to have proven at trial and are not the amounts asked for in its amended petitions.
[2] The Newman Partnership, Inc., began transacting business as the Newman Marchive Partnership, Inc., in 2000; suit was filed under the new corporate name, although most of plaintiff's claims are based upon events which transpired prior to the year 2000.
[3] Comment (d) to Civil Code article 1989 points out that putting the obligor in default is not a prerequisite to filing suit for specific performance because the judicial demand itself amounts to a putting in default. Article 1991 of the Civil Code also provides in part that an obligee may put an obligor in default by a written or oral request of performance or by a specific provision of the contract.