936 So.2d 247 (2006)
SCENICLAND CONSTRUCTION CO., LLC, Plaintiff-Appellee,
v.
ST. FRANCIS MEDICAL CENTER, INC., Defendant-Appellant.
No. 41,147-CA.
Court of Appeal of Louisiana, Second Circuit.
July 26, 2006.
*249 William A. Jones, Jr., Michael S. Coyle, Ruston, for Appellant.
James A. Rountree, Monroe, for Appellee.
Before STEWART, GASKINS and DREW, JJ.
GASKINS, J.
St. Francis Medical Center, Inc., the defendant in this breach of contract case, appeals from the portions of a trial court judgment favoring the plaintiff, Scenicland Construction Co., LLC. We amend the judgment and, as amended, affirm.

FACTS
In November 2001, Scenicland and St. Francis entered into a contract for the renovation of patient rooms. The contract was drafted by Fred Bayles, the managing member of Scenicland. In pertinent part, the contract provided:
1. Property to be renovated. Contractor agrees to renovate and Owner agrees to pay Contractor for renovation improvements to individual patient rooms in accordance with model renovations in patient room 5004 attached hereto as Exhibit "A" and made a part hereof by Contractor on rooms to be designated by Owner ...
2. Price. Owner agrees to pay Contractor the sum of Three Thousand and no/100 ($3,000.00) dollars per unit, based on renovating two hundred twenty-three (223) units as set forth in paragraph 4 herein....
...
4. Payment Date. Owner will pay contractor after the completion of each group of rooms completed and accepted within 48 hours of said acceptance. Each group of rooms to be renovated will consist of 10 to 17 rooms. . . .
The price per unit was later raised to $3,500. Scenicland renovated 75 rooms at the $3,000 per unit rate, and 15 rooms at the $3,500 rate, for a total of 90 rooms. At this point, St. Francis required immediate work on its rehabilitation unit on the seventh floor. This project involved severe time restraints. Scenicland agreed to *250 meet the timetable for the project; it was awarded the job without bidding. The rehabilitation unit project was completed in a timely fashion. St. Francis then asked Scenicland to look at its ICU facilities with an eye toward completely renovating them. However, the ICU project was ultimately awarded to another company. Contrary to Scenicland's expectations, the original room renovation project was not resumed.
Scenicland filed suit against St. Francis on April 4, 2003. It asserted that, although it and St. Francis had a contract for Scenicland to renovate 223 hospital rooms, St. Francis defaulted after only 90 were completed. It also contended that St. Francis was liable to it in the amount of $68,391.67 for additional work it performed. This included $3,000 for the carpenter shop; $38,391.67 for the cost of materials purchased for the job and storage of material for the hospital; and $27,000 for the preliminary design of ICU units. Scenicland also alleged that St. Francis promised it the ICU renovation job as a reward for the "Herculean effort" necessary to complete a project on the rehabilitation facilities on the seventh floor by St. Francis' deadline. It sought to recover lost profits for the remaining portion of the room renovation job and the ICU project.
On May 20, 2003, St. Francis filed its answer, generally denying the claims in the plaintiff's petition. It also pled the affirmative defenses of the plaintiff's failure to mitigate damages and the right of offset or extinguishment or partial extinguishment of an obligation. The latter involved St. Francis' claim that it had to replace substandard work performed by Scenicland.
On May 14, 2004, St. Francis filed an amended answer in which it stated that the contract did not provide for the plaintiff to renovate 223 rooms; instead it provided that it was to renovate the rooms designated by the defendant. It also reiterated the affirmative defense of offset or extinguishment or partial extinguishment of an obligation.
St. Francis filed a reconventional demand against Scenicland on June 29, 2004. It alleged that it had to secure the services of another contractor to correct Scenicland's substandard work. According to St. Francis, it had already paid in excess of $40,000 and anticipated additional costs. In its answer to the reconventional demand, Scenicland asserted that certain problems with its work were caused by St. Francis' haste in flooding floors and making renovated rooms available to patients before floor glue had an opportunity to adhere.
Bench trial began on April 25, 2005, and concluded on April 29, 2005, at which time the judge took the matter under advisement. On July 18, 2005, the trial court gave written reasons for judgment. It found in favor of the plaintiff on breach of contract as to the 223 rooms and granted relief in the amount of $156,408. The court based its determination that the contract called for renovation of 223 rooms on the wording of the contract (which gave a price per unit based on renovating 223 units) and the deposition testimony of Jean-Paul Lejeune. As chief operating officer, Lejeune signed the contract on St. Francis' behalf; he testified that the room renovation project was temporarily placed on hold in favor of the rehabilitation unit with the intention that the room renovations would resume after the completion of the seventh floor work. The court also found in the plaintiff's favor on the issues of "materials" and "storage" and awarded, respectively, $20,000 and $10,000.
The court ruled in favor of the defendant and against the plaintiff on the claim *251 of detrimental reliance on the ICU project. It based this decision on Lejeune's testimony that while St. Francis was interested in Scenicland doing the work, it wanted to go through the full bid process on that project. It also dismissed the defendant's reconventional demand, noting that Lejeune testified that he had no problem with Scenicland's work and that the hospital's housekeeping had twice flooded the area before the floors were cured. Judgment was signed on July 19, 2005, and an amended judgment on July 29, 2005.
St. Francis appeals the provisions of the trial court judgment provisions awarding recovery to Scenicland and denying its reconventional demand as to the floors that had to be redone.
Scenicland answered the appeal, arguing that the judgment should be amended to include damages of $190,455 for its detrimental reliance on St. Francis' promise of the ICU contract. However, Scenicland withdrew its claim at oral argument. Consequently, this matter is no longer before the court.

CONTRACT TERMS
St. Francis contends that the trial court erred in finding that its contract with Scenicland called for the renovation of 223 rooms. It points to a provision that calls for renovation of rooms "to be designated by Owner." It argues that Scenicland wrote the contract and created ambiguity (the inclusion of a per unit price for 223 rooms instead of a lump sum) which should now be construed against it. St. Francis' witnesses asserted that the remaining rooms were not renovated due to declining patient numbers and poor financial performance. However, St. Francis points out that while Scenicland did not get to renovate 133 other patient rooms for a price of $465,500, it was awarded the seventh floor rehabilitation unit job which amounted to $1,692,225.
When a contract is subject to interpretation from the four corners of the instrument, without the necessity of extrinsic evidence, that interpretation is a matter of law. NAB Natural Resources, L.L.C. v. Willamette Industries, Inc., 28,555 (La.App.2d Cir.8/21/96), 679 So.2d 477. In the case of ambiguity in a contract, where factual findings are pertinent to the interpretation of a contract, those factual findings are not to be disturbed unless manifest error is shown. However, when appellate review is not premised upon any factual findings made at the trial level, but is instead based upon an independent review and examination of the contract on its face, the manifest error rule does not apply. In such cases, appellate review of questions of law is simply whether the trial court was legally correct or legally incorrect. Lawrence v. Terral Seed, Inc., 35,019 (La.App.2d Cir.9/26/01), 796 So.2d 115, writ denied, XXXX-XXXX (La.2/1/02), 808 So.2d 341.
A contract is an agreement by two or more parties whereby obligations are created, modified or extinguished. La. C.C. art. 1906. Legal agreements have the effect of law upon the parties. La. C.C. art. 1983. A contract is the law between the parties and courts are bound to give legal effect to all such contracts according to the true intent of the parties. La. C.C. art. 2045. Newman Marchive Partnership, Inc. v. City of Shreveport, 40,512 (La. App.2d Cir.2/24/06), 923 So.2d 852.
When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. C.C. art. 2046. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a *252 whole. La. C.C. art. 2050. In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text. La. C.C. art. 2056.
La. C.C. art. 2045 directs that the common intent of the parties is used to interpret a contract. Parol evidence is inadmissible to vary the terms of a written contract. However, if that contract could have more than one interpretation, there is ambiguity as to its provisions, or the intent of the parties cannot be ascertained by the language, then parol evidence is admissible to clarify the ambiguity and show intent of the parties. Fleet Fuel, Inc. v. Mynex, Inc., 40,683 (La.App.2d Cir. 3/8/06), 924 So.2d 480.
We find that the contractual language is unclear and therefore ambiguous. However, both persons signing the contract testified that the intent was that the contract covered all 223 rooms. Jean-Paul Lejeune, the executive vice president and chief operating officer of St. Francis who signed the contract on its behalf, testified in his deposition that the contract meant all of the 223 units were to be renovated. This being the common intent of the signers of the contract, the trial court was not in error in finding the contract provided for the renovation of 223 rooms.

LOST PROFITS
St. Francis complains that the trial court did not properly calculate damages for lost profits. It also contends that the award of $156,408 was excessively high, representing an unreasonable profit of 33.6 percent of the gross contract amount. The hospital further argues that Scenicland's records are substandard and prohibit an accurate calculation of its lost profits.
Lost profits are recoverable in an action for breach of contract where the amount can be proved with reasonable certainty. Al Smith's Plumbing & Heating Service, Inc. v. River Crest, Inc., 365 So.2d 1122 (La.App. 4th Cir.1978). Loss of profit awards may not rest on speculation or conjecture unless direct evidence is not available to establish this element of damage. Al Smith's Plumbing & Heating Service, Inc. v. River Crest, Inc., supra. Customary or foreseeable profit may be resorted to as a measure of damage where there is no direct evidence of the exact extent of loss. Al Smith's Plumbing & Heating Service, Inc. v. River Crest, Inc., supra; Ellwest Stereo Theatres, Inc. v. Davilla, 436 So.2d 1285 (La.App. 4th Cir. 1983), writ not considered, 442 So.2d 454 (La.1983).
Broad latitude is given in proving lost profits because this element of damages is often difficult to prove and mathematical certainty or precision is not required. Cox Communications v. Tommy Bowman Roofing, LLC, XXXX-XXXX (La.App. 4th Cir.3/15/06), 929 So.2d 161.
David Lewis Johnston was Scenicland's expert witness who computed its damages for lost profits as a result of St. Francis' termination of the room renovation contract. He testified that he examined and "tested" the accounting information supplied to him by Scenicland in order to reach his conclusions. According to his testimony, had Scenicland been allowed to finish the contract, it would have realized a total profit of 33.6 percent or $216,034 ($156,408 from the contract and $59,626 from "extras.") However, Scenicland did not keep individual cost and profit records on the room renovation work. Although intensely cross-examined about the quality and substance of Scenicland's records, which included some mistakes and omissions, Johnston maintained that he had adequate information to compute the lost profits and insisted that he could express *253 an opinion with a reasonable degree of professional certainty.
St. Francis presented its own expert accounting witness, Robert Lewis Smith, Jr.; he was hired to review Johnston's work in the instant case. He testified that he was unable to reconcile various financial statements to each other. While he could not argue with Johnston's methodology, he did criticize the data Johnston applied which he characterized as inconsistent, inaccurate and untimely. Smith also testified that information he obtained from the Construction Financial Managers Association indicated that the average gross profit percentage in the construction industry is between 4.2 and 9.3 percent. He testified that the highest gross profit margin he had seen recently was 15 percent. For hospital work, it went from 8.2 percent to 14 percent.
The effect and weight to be given to expert testimony rests within the broad discretion of the trier of fact. Williams v. State Farm Mutual Automobile Insurance Co., 36,439 (La.App.2d Cir.10/23/02), 830 So.2d 379. It is well accepted that the trier of fact is charged with the determination of what credibility it assigns to expert witnesses and the decision about which expert among those testifying is more credible. Hayes v. Entergy Corporation, 37,190 (La.App.2d Cir.6/25/03), 850 So.2d 916. Credibility determinations, including the evaluation and resolution of conflicts in expert testimony, are factual issues to be resolved by the trier of fact which should not be disturbed on appeal absent manifest error. James v. Robinson, 38,774 (La.App.2d Cir.8/18/04), 880 So.2d 975.
Where expert testimony differs, it is the trier of fact who must determine the more credible evidence, and factual findings based upon that determination may not be overturned unless manifest error appears in the record. The fact-trier is entitled to assess the credibility and accept the opinion of an expert just as with other witnesses, unless the stated reasons of the expert are patently unsound. Of course, the effect and weight to be given such expert testimony depends upon the underlying facts and rests within the broad discretion of the trial judge. Moreover, in deciding to accept the opinion of one expert and reject the opinion of another, a trial court can virtually never be manifestly erroneous. Fox v. Fox, XXXX-XXXX (La.App. 1st Cir.11/6/98), 727 So.2d 514, writ denied, XXXX-XXXX (La.3/19/99), 740 So.2d 119.
The trial court awarded damages of $156,408, the amount suggested by Scenicland's expert as the amount that it would have earned had it been allowed to complete the room renovation contract. The court obviously accepted Johnston's testimony while discounting Smith's attacks upon the underlying bases used by Johnston in making his calculations.
Based upon our review of the record, we are unable to say that the trial court was manifestly erroneous in its decision to accept the testimony of Johnston, Scenicland's expert. The testimony of St. Francis' expert, Smith, raised questions as to certain aspects of Johnston's conclusions, but it did not establish that Johnston's reasons were "patently unsound."

EXCESS MATERIALS
St. Francis maintains that, according to a "joint inventory" conducted on May 20, 2004, there were only renovation materials totaling $2,142.09, not the $20,000 awarded by the trial court.
The plaintiff is required to prove special damages by a preponderance of the evidence, and the findings of the district court in this respect are subject to a manifest *254 error standard. Johnson v. State through Dept. of Public Safety and Corrections, 95-0003 (La.App. 1st Cir.10/6/95), 671 So.2d 454, writ denied, 95-2666 (La.1/5/96), 667 So.2d 522.
According to the evidence presented through the testimony of Fred Bayles of Scenicland, the company had items totaling $30,891.67 for use on the room renovation project which were not used because of St. Francis' failure to continue the project. However, Scenicland was able to mitigate its damages by using $10,054.57 worth of items on other projects. As a result, the trial court awarded Scenicland $20,000 for its purchase of unused materials for the room renovation project. Although Donald Bryant Harold, St. Francis' manager of plant operations and maintenance, visited the Scenicland warehouse and testified as to an inventory of the items there, the trial court chose to rely upon Bayles' testimony on this issue. We find that the trial court was not clearly wrong to do so. The award of $20,000 was not an abuse of the trial court's discretion and is affirmed.

STORAGE DAMAGES
As to the storage costs of $10,000 awarded by the trial court for Scenicland's storage of St. Francis materials and equipment, St. Francis argues that no award should be made because Scenicland failed to prove any costs on this issue.
Harold, St. Francis' manager of plant operations and maintenance who visited the Scenicland warehouse, testified that it would take between five and eight 12 x 10 mini-warehouses to house the St. Francis materials in Scenicland's possession. Based on his personal experience, Harold testified that these mini-warehouses cost $30 per month. By our calculations, storage in eight such mini-warehouse from November 2002, when St. Francis announced its intention to not honor the rest of the room renovation contract, to the date of trial in April 2005, would cost $7,200. We find that the award of $10,000 was an abuse of the trial court's discretion and amend the judgment to allow $7,200 in special damages for Scenicland's storage of property belonging to St. Francis.

RECONVENTIONAL DEMAND
As to its reconventional demand, St. Francis argues that the evidence demonstrated faulty materials and workmanship in the renovation of the floors, including the use of an improper adhesive in an improper amount and the use of an improper trowel. As a result, St. Francis alleged that it was forced to repair the substandard work and have the floors redone by another contractor. It also contends that, contrary to Scenicland's assertions, its "wet-cleaning" of the floors was proper and caused no damage.
A trial court's factual findings are accorded great weight and will not be disturbed on appeal absent manifest error. Rosell v. ESCO, 549 So.2d 840 (La.1989). It is the duty of the trier of fact to weigh credibility and to accept or reject all or part of a witness's testimony. Marshall v. Caddo Parish School Board, 32,373 (La. App.2d Cir.10/29/99), 743 So.2d 943. Where there is a conflict in the testimony, reasonable evaluations of credibility should not be disturbed on appeal. Rosell, supra.
The trial court specifically accepted the testimony of Lejeune that there was a problem with the way hospital employees cleaned the floors around the time the project was turned over, flooding the floors before they were cured. George Stennett, St. Francis' former director of facilities and a current employee of Bayles, also testified that tiles began to come up after St. Francis' housekeeping failed to allow the floors to cure before pouring water and *255 stripper on them. According to Stennett, Bayles was upset and offered to hire someone to clean up the floors; however, Lejeune declined the offer and instead paid him to replace the tiles damaged due to the hospital's actions. Bayles testified that the hospital's actions in flooding the rooms to clean the floors damaged the glue because they did not wait five days, as recommended by the manufacturer, to allow the floors to cure. Lejeune declined to let him clean the floors.
St. Francis presented the testimony of its former president and chief executive officer, H. Gerald Smith, that the hospital experienced problems with glue seepage from the floors renovated by Scenicland. According to Ronald Ernest Hogan, St. Francis' chief financial officer, the hospital paid Dupuy Flooring $55,195 to replace some of the flooring installed by Scenicland. To his knowledge, Scenicland was not requested to remedy the floors.
Stanley Dupuy, who was one of the owners of J.E. Dupuy Flooring and Acoustical, testified that, in his opinion, Scenicland had applied too much of the wrong adhesive. However, he admitted that, while doubtful, mopping the floors prematurely could possibly cause glue seepage.
The trial court was presented with conflicting testimony and elected to accept that offered by Scenicland to the effect that the glue seepage problem was caused by the hospital's actions in flooding the floors before they were allowed to properly cure. Our review of the record reveals that the trial court was not clearly wrong in making this determination.

CONCLUSION
The judgment of the trial court is amended to reduce the damages for storage from $10,000 to $7,200. In all other respects, the judgment is affirmed.
AMENDED AND, AS AMENDED, AFFIRMED.