DREW, J.
|!Billy Joe Edwards challenges a damage award- of $600,000 against him and in favor of Endurall, Inc., for the violation of a noncompete agreement. For the following reasons, we affirm.
FACTS
The background of this dispute is set forth in Pattridge v. Starks, 50,135 (La.App.2d Cir.11/18/15), 181 So.3d 192 (“Pattridge II”). Briefly, in 2004, four investors [1] formed a Louisiana company, Endu-rall, Inc., to manufacture and sell rod guides to the oil and gas industry. The investors all signed a noncompete agreement stating that if any of them were terminated as shareholders, they would not compete against Endurall within 24 months after termination. Appellant Edwards was eventually fired from Endurall as an employee, and after a dissolution fight, he was terminated: as a shareholder on July 31, 2013, when the company’s stock was acquired at auction by two of the original investors, David Pattridge and Gary Gardner.[2]
Edwards then worked for another energy-related business, Skye Petroleum, marketing paraffin products to many of Endu-rall’s customers. He used some of his *1115 share of the proceeds from the Endurall stock auction to help his son Greg Edwards form a new company, DHE, LLC (“DHE”); DHE commenced doing business in March 2014. DHE, whose office was located in Benton, Louisiana, in the same building as the office .of Skye Petroleum, competed against Endurall in the manufacture and sale of rod | ^guides. Several of Endurall’s former sales reps and customers switched from Endurall products to DHE products, and Endurall’s sales declined.
Endurall, Pattridge, and Gardner sued Edwards in June 2014, alleging that his actions violated the noncompete agreement and damaged Endurall’s business. The district court concluded that Edwards had violated the agreement, and in Pattridge II, this court affirmed that determination, observing:
In its reasons for ruling, the trial court specifically cited the timing and destinations of Edwards’ business trips on behalf of Skye Petroleum and the more than coincidental happenstance that those trips coincided with the opportunity for Edwards to conduct DHE, LLC business. It also took notice of Edwards’ admissions that: he was distributing Gary’s phone number on behalf of DHE, LLC; he helped obtain the building for DHE, LLC; and, he had an office in that Same building. The trial court considered that' the money Edwards received from the salé of his stock in Endurall had been pledged to secure the loan for the founding and" operation of DHE, LLC.
The district court held a separate trial to determine the damages owed by Edwards to Endurall under La. R.S. 23:921(H).[3] At the damages trial, the court heard a variety of testimony concerning Edwards’ actions and the effect the premature competition from DHE had on Endurall’s sales, and concluded that Endurall was entitled to $600,000 from Edwards.
Edwards . appealed from the ensuing judgment in favor -of Endurall, arguing:
• The District "Court erred in finding that Edwards’ allegéd violations of the •noncompetition agreement caused damage to plaintiffs. ■
h* The District Court erred in considering competing activities that took place outside of Louisiana in finding that Edwards violated the noncompet-ition agreement and that these activities caused damages to plaintiffs.
• The District Court erred in calculating the amount of the damage award to plaintiffs because the award was based on past and future losses which were too speculative and uncertain. ■
• The District , Court erred in awarding damages for the period after the expiration of the noncompetition agreement on July 31, 2015.
DISCUSSION
Assignment of Error 1. The District Court erred in finding that Edwards’ alleged violations of the noncompetition agreement caused damage to plaintiffs.
Whether or not a particular act has caused another’s damages is a question of fact that must be proven by a preponderance of evidence. See, e.g., Nichols v. NLU, 31,120 (La.App.2d Cir.2/24/99), 729 So.2d 733, writ denied, 99-1209 (La.6/4/99); 744 So.2d 633.
*1116 A court of appeal may not set aside a trial court’s finding of fact in the absence of manifest error or unless it is clearly wrong, and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840 (La.1989). See also Stobart v. State through Dept. of Transp. & Dev., 617 So.2d 880 (La.1993). An appellate court must not base its determination on whether it considers the trier of fact’s conclusion to be right or wrong, but on whether the fact finder’s conclusion was reasonable. Stobart, supra. The appellate | ¿court must not reweigh the evidence or substitute its own factual findings because it would have decided the case differently. Pinsonneault v. Merchants & Farmers Bank & Trust Co., 2001-2217 (La.4/3/02), 816 So.2d 270. With regard to decisions of law, however, a trial court’s ruling is subject to de novo review. Hall v. Folger Coffee Co., 2003-1734 (La.4/14/04), 874 So.2d 90.
In rendering its decision on damages, the trial judge had the benefit of having presided over the previous trial concerning the enforceability and breach of the non-compete agreement. There, the judge heard, among other things, details about Billy Joe Edwards’ travels, purportedly on behalf of Skye Petroleum, that coincided with the loss of Endurall customers in the areas where he traveled. At the damages trial, the judge likewise heard testimony from several witnesses.[4]
David Pattridge testified:
• Before his termination, Billy Joe Edwards was the “sales arm” of Endurall and had relationships with the sales reps and some of the customers.
• After Billy Joe Edwards was fired from Endurall, the sales reps continued to buy from Endurall until the formation of DHE.
• Endurall had lost “a considerable amount of business” since the formation of DHE.
• Upon the formation of DHE, three former Endurall sales reps — Tom Hearring, Mike Kelly, and Mike Carr — switched from selling Endurall rod guides to selling DHE rod guides in | fithe first quarter of 2014.
• These three reps were close to Billy Joe Edwards prior to the formation of DHE.
• Endurall thereafter lost about one-third of its customers and these customers were “relatively in these three reps’ areas”.
• Billy Joe Edwards visited numerous customers of Endurall on several business trips, and these customers thereafter stopped buying from Endurall.
Gary Gardner testified:
• Since the formation of DHE, Endurall lost roughly one-third of its domestic customers and close to half of its domestic revenue.
• Endurall was engaged in a price war with DHE to try to recover some customers after- DHE “went into our markets with our sales reps and ... cut prices. They knew what our prices *1117 were and they started slashing prices to beat us.”
• Prior to DHE’s formation, Endurall “never noticed a loss” from then-existing competitors.
• Three former Endurall sales reps— Tom Hearring, Mike Kelly, and Mike Carr — all quit as Endurall reps on the same day in March 2014, and Éndu-rall’s sales stopped in their areas.
• These reps left Endurall only upon the formation of DHE; they had originally stayed with Endurall even after Billy Joe Edwards left Endurall.
• Billy Joe Edwards’ financing allowed . the formation of DHE.
• Billy Joe Edwards’ business trips to areas where ¡Endurall’s customers and reps were located predated the formation of DHE.
Endurall’s business valuation expert/CPA, Benjamin Woods, testified primarily about the calculation of damages, not about the cause.[5] He said |Bthat he based his calculations on a list of lost customers provided to him by Endurall.
Defendant Billy Joe Edwards testified:
• Beginning in 2013, he traveled to Oklahoma, south Arkansas, and Illinois, all places where Endurall had customers.
• The customers he visited “had paraffin issues” and that was- the purpose of the visits.:
• He gave his son’s phone number to two people.
• On the trip to Illinois, he and the current Endurall rep visited Endurall customers, and Edwards answered “jf you say so” when asked, if the Illinois Endurall customers now bought rod guides from DHE.
• When a Mississippi customer of Endu-rall asked Edwards about rod guides, Edwards “handed the phone to Greg.”
'•He “might have” read a letter announcing the formation of DHE that Greg sent to potential rod guide customers:
“My father, Billy Joe Edwards, was the co-inveritor of the original Endurance Rod Guide made out of UHMW-PE. He started Down Hole Enterprises in the mid 1980s, later changing the name of the company to Endurall, Inc. Billy Joe recently sold his interest in the company and is now working with ... Skye Petroleum^]”
[[Image here]]
“Having worked with my dad since the beginning with, .both Down Hole Enterprises and Endurall, I have the knowledge necessary to produce the ULTRA Poly Rod Guide. We will offer all of thé standard sizes of guides and be able to custom design and manufacture any size our’ customers may need.”
Both the defendant and His wife, Judy, testified that they pledged $500,000 in CDs — money they received from the sale of Endurall’s stock — to a bank so that Greg could obtain a line of credit to start DHE.
Mike Kelly testified:
• He was' an owner of Flow Specialties, Inc., a manufacturer’s rep for oilfield . products.
(?• He previously was a rep for Endurall, but now sold DHE rod guides.
• Billy Joe Edwards told Kelly in January 2014 about the formation of DHE, and Kelly first saw a DHE rod guide in the first week of February. On February 14, 2014, he gave Endurall a .30-day notice that he was terminating his sales agreement with Endurall.
• He switched to selling DHE rod guides because he thought DHE’s *1118 product was going to be better than Endurall’s, but at that time, he had never seen a DHE guide in the. field.
• He traveled with Billy Joe Edwards to south Arkansas in August and September 2013 and March 2014-to visit customers who also happened to be Endu-rall customers.
• One of the Endurall customers dsked Billy Joe Edwards if he was in -the rod guide business, and Billy Joe said, “No, but my son is,” and that Endurall customer is now a DHE customer.
• His decision to stop being an Endurall rep was partly due to Gardner and Pattridge’s actions of firing Billy Joe Edwards and suing a company that Kelly had invested in.
Gregory Edwards testified:
• He was the owner and sole member of DHE, LLC, which started business on March 17,2014.
• He financed DHE with $500,000 in CDs in his mother’s name.
• This backing allowed him -to buy a Haas turner machine that allowed him to make a better rod guide than Endu-rall made.
• Billy Joe Edwards referred at least two and perhaps four or five customers to DHE.
• Customers who switched from Endu-rall rod guides to DHE rod guides did so without ever having seen the DHE guide perform.
• He sells to many customers through sales reps and does not know whether these customers were former Endurall customers.
A portion of the deposition testimony of former Endurall reps Tom | sHearring and Jamie Mims was also introduced into evidence. Hearring said he first heard about the formation of DHE in an email from Greg Edwards in January or .February 2014, and that he had discussed the company with Billy Joe- Edwards who told him, “Greg was going to start making rod guides.” Hearring said that he decided to switch to selling DHE guides “because Greg was making them, and I thought I’d have a little better shot with his guides...'. " A little bit better made.” Hearring first'saw a DHE rod guide in April 2014, after he terminated his agreement with Endurall and had discussed the technical aspects of the DHE guides with Billy Joe Edwards “a little bit.... Once or twice, maybe.”
Jamie Mims testified that his first contact with Greg Edwards was by email, and explained that he got Greg’s email address from Mike Carr about six months before the date of the deposition. .
■ The trial judge gave his reasons for finding that Billy Joe Edwards’ breach of the noncompete agreement caused Endu-rall damages:
I do find for the reasons stated in plaintiffs’ pretrial memorandum[6] and argued by him at trial that there was sufficient connexity. There was causation proved to the Court’s satisfaction between Mr. Edwards’ violation of the non-compete and the resulting injury or damages to the plaintiffs.
This court has exhaustively reviewed all the testimony of the witnesses and concludes that the record fully supports the trial judge’s finding that Edwards’ conduct caused Endurall to lose revenue because his 19post-termination contacts with Endurall reps and customers led these reps and customers to leave long *1119 standing relationships with Endurall and switch to DHE products.
Key to this determination is the fact that the reps switched to DHE products before they had any experience with the DHE products. In fact, some reps gave notice to Endurall prior to DHE’s official startup date of March 17, 2014. We agree with appellees that the defendant’s activities and Endurall’s ensuing losses were “more than mere coincidences.” The letter Greg Edwards sent to prospective customers relied heavily upon the defendant’s knowledge and expertise in the rod guide industry to sell DHE guides and did so with his father’s knowledge. Finally, DHE was seeded with funds, obtained through the pledge of the defendant’s assets.
The trial judge, who was very familiar with the case and the parties after two trials, essentially made a credibility call here and disregarded Edwards’ testimony in favor of the evidence that his actions and Endurall’s losses were related, and we find no reason to disturb the trial court’s conclusion.
Assignment of Error 2. The District Court erred in considering competing activities that took place outside of Louisiana in finding that Edwards’ violated the noncompetition agreement and that these activities caused damages to plaintiffs.
The appellant’s second assignment is related to its first assignment, arguing that the trial court erred in finding a causal connection between his conduct and En-durall’s losses. The appellant argues that the plaintiffs failed to show that they should be compensated for losses that may have been caused by the defendant’s conduct outside the State óf Louisiana or the | ^five-parish area where the trial court intended to apply the ■ noncompete agreement. They urge that Edwards’ business trips took-him outside Louisiana, and that his conduct in those other states cannot support an award of damages under the Endurall noncompete agreement, which was not enforceable outside of the Louisiana parishes where Endurall did business.
The appellee argues that, this court should not consider this issue because Edwards did not raise it in the trial court,[7] where it might better have been explored and where the trial court could have had a chance to (1) decide the merits of the argument and (2) decide what parts of the defendant’s conduct occurred within the noncompete area.
Although we tend to agree with the ap-pellees that this argument was not squarely presented to the trial judge[8] and the evidence might have been better presented to formulate a decision on the issue had it been raised below, we are also mindful that the plaintiff had the burden of proving causation and damages and that noncom-pete agreements are not traditionally interpreted expansively in Louisiana jurisprudence.
*1120 |nAs this court stated in its opinion in Pattridge II:
If Edwards had desired to continue work in the rod guide business, the only thing he had to do was respect the narrow scope of the agreement he made with Endurall and either wait out the two-year time period or go work outside the geographical area in which Endurall conducted business. Edwards did neither; he immediately took the money he was paid for his shares of stock and helped his son found a company designed 'to compete directly with Endu-rall.
DHE’s office was in Benton, Louisiana, in the same building where Billy Joe Edwards worked for1 Skye Petroleum, allowing Billy Joe easy access to DHE’s business operations. The profits that Endurall lost from customers both inside and outside Louisiana would have accrued to En-durall’s benefit in Louisiana, and instead those profits were earned by DHE, another Louisiana business supported by Billy Joe Edwards that was located a few miles from Endurall and within the area covered by the noncompete. We agree with the appellees’ argument in brief:
First, DHE is located in Bossier Parish and operates there exclusively. All of its design, manufacturing and marketing processes are housed in Bossier Parish. All operations and assets owned by DHE are operating and located in Bossier Parish. DHE does not maintain offices in any other location. All rod guides sold anywhere in the world for DHE are manufactured and shipped from the DHE facility in Bossier Parish. All sales orders for DHE are taken from Bossier Parish and fulfilled from Bossier Parish. Thus, all of Edwards’ promotional acts on behalf of - DHE were designed to promote and assist a Bossier Parish entity.
Second, Edwards’ office space was located inside the same building as DHE, in Bossier Parish, until he was ordered to vacate his office for violating the non-compete, covenant. Like DHE, Edwards did not maintain any additional offices in any other location. Third, Edwards’ pledge of the $500,000 in CDs to DHE’s lender — which was essential to DHE’s ■ creation, occurred in Bossier Parish. Fourth, Gregory sent letters and Edwards made phone calls to Endu-rall customers and sales representatives from Bossier Parish. Fifth, Edwards planned, | ^coordinated, and scheduled his trips to Endurall customers from his home or office, both located in Bossier Parish. Edwards also traveled to those locations from Bossier Parish.
Edwards’ actions to compete against En-durall were primarily concentrated in Bossier Parish, and this court has ; already affirmed that Edwards was competing against Endurall in Bossier Parish. The lack of objection at trial means that it is difficult on the present record to distinguish the harm caused by the defendant’s actions within the state from the harm caused by his actions outside the state. Accordingly, we decline to limit the damages award to Endurall because Edwards accomplished some of his goal by traveling and acting outside of Louisiana. The genesis of all Edwards’ activity was in Bossier Parish.
Assignment of Error 3. The District Court erred in calculating the amount of the damage award to plaintiffs because the award was based on past and future losses which were too speculative arid uncertain.
Both Pattridge and Gardner testified at the 2015 damages trial that- they believed *1121 that DHE’s entry into the rod guide market had cost Endurall over $980,000 in sales. Their expert, Benjamin Woods, testified that Endurall lost $934,524 in profit from sales lost to DHE. The trial court .substantially discounted both of those amounts to an even $600,000, an amount that appellant argues was still too high.
Appellant first argues that the expert’s method of valuing the loss did not conform to the proper legal standard of measuring lost profits but instead relied upon an improper measure of damages. Further, he argues that the expert’s forecast assumed that Edwards was responsible for “every sales dollar that Endurall may have lost after the formation of DHE, | ^regardless of why the sale was lost, and without regard to whether the sales that Endurall allegedly lost were ultimately made to DHE.” Finally, appellant also criticizes the expert valuation on the grounds that it assumed (1)' Endurall would have kept, until 2020, the customers it claimed to have lost to DHE, regardless of competition from Billy Joe Edwards after the expiration of the noncompete agreement, (2) the oil ’and gas industry would remain stabilized through 2020 and ' Endurall’s sales would likewise be stable, and (3) Endurall’s pricing and overhead would have remained the same through this period.
A violation of a noncompete agreement is a breach of an obligation not to do. La. R.S. 23:921(H). The breach of this obligation “may entitle the obligee to recover damages for the loss sustained and the profit of which he has been deprived.” Id.; see also La. C.C. art. 1995. When damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages. La. C.C. art. 1999.
This court stated in ScenicLand Const. Co., LLC v. St. Francis Med. Ctr., Inc., 41,147 (La.App.2d Cir.7/26/06), 936 So.2d 247, 252:
Lost profits are recoverable in an action for breach of contract where the amount can be proved with reasonable certainty. Al Smith’s Plumbing & Heating Service, Inc. v. River Crest, Inc., 365 So.2d 1122 (La.App. 4th Cir.1978). Loss of profit awards may not rest on speculation or conjecture unless direct evidence is not available to establish this element of damage. Al Smith’s Plumbing & Heating Service, Inc. v. River Crest, Inc., supra. Customary or foreseeable profit may be resorted to ,as a measure of damage where there is no direct evidence of the exact extent of loss. Al Smith’s Plumbing & Heating Service, Inc. v. River Crest, Inc., supra; Ellwest Stereo Theatres, Inc. v. Davilla, 436 So.2d 1285 (La.App. 4th Cir.1983), writ not considered, 442 So.2d 454 (La.1983). Broad latitude is given in proving lost profits because this element of damages is often ludifficult to prove and, mathematical certainty or precision is not required. Cox Communications v. Tommy Bowman Roofing, LLC, 2004-1666 (La.App. 4th Cir.3/15/06), 929 So.2d 161.
• Plaintiffs’ expert, Benjamin Woods, prepared a report[9] in advance of trial using “two generally accepted methods for determining damages to a company as a result of impaired operations.” The first method, the “before and after” method, compares the company’s performance pri- or to the event to its performance after the event. The second method, a discounted future earnings method, compares the fair *1122 market value of the company prior to and after the event. Woods’ preliminary estimate under method one was a loss to Endurall of $1,049,349, and his estimate of loss under method two was $1,054,887.
At trial, he explained that the first method was “a typical model used in damages cases” that compares how a company was doing prior to and after an event. The model included sales, history, avoidable costs, and variable expenses not incurred due to lost sales. He described the second method as a “sanity check” for the first method using a comparison of the fair market value of the company prior to and after the event. ■
Woods based his estimate of the damages to Endurall from DHE upon a list of lost customers supplied to him by Endu-rall; among other things, he looked at ■Endurall’s sales to these customers in comparison to sales to other customers that were not lost to DHE. He said that he had discussed the list of lost customers with Gaiy Gardner “to make sure that we were being | ^conservative in our approach and we weren’t claiming a customer that maybe shouldn’t be on the list.” ■ Woods prepared a graph of EnduraU’s performance over time and noted that there was (1) significant quarter-to-quarter volatility in sales but (2) only a “very loose correlation” between Endurall’s sales and the price of oil; in other words a decline in the price of oil would not necessarily directly lead to a decline in Endurall’s sales.
Woods testified that he estimated Endu-rall’s lost sales for those quarters for which the company had actual sales data and then extrapolated that information from the fourth quarter of 2014 to the fourth quarter óf 2020. Woods stopped the calculation in 2020 because extrapolate ing further “wouldn’t be real meaningful ... because we’re discounting it at such an aggressive 28% rate” and because “2020 is far enough to kind of recover ... these lost sales become less and less meaningful over time.”
Woods offset the lost sales data by a number’ of avoidable costs, such as cost of production, that would have been incurred had the sales been made. He explained that after being deposed, he had increased his calculation of avoidable costs to include more sales commission and shipping costs. After increasing those numbers, Woods explained,- his second estimate for the loss of profit to Endurall through 2020 was $984,524. Woods further explained that, based upon other more recent information, his calculation may not fully have taken into account the commissions paid to sales reps, and he allowed that the loss of profit to Endurall might be as low as $934,000.
| ^Defendant’s counsel ably and thoroughly cross-examined Mr.' Woods. Counsel suggested to Woods that the proper measure of damages was “gross sales minus expenses equals net income or net profit,” to which Woods replied that he did not use that measure and that he had “never seen a damage report that calculated damages that way from an event. It’s never been a net income number.” Woods further admitted that he employed several assumptions in his calculation, including assuming that Endurall would never regain the sales it lost in the first three quarters of 2014 and that Endurall’s quarterly loss would remain consistent through the end of 2020. Woods also admitted that he calculated Endurall’s costs based upon its current cost of production including the current labor costs which could, potentially, be reduced if necessary. Woods’ model also assumed a 14% per year increase in sales for Endurall. Woods admitted this was not supported by Endurall’s history but explained that,.it was necessary because “the expectation that they will grow *1123 it back is what gives it value — any value today.”
He also was asked to compare the number of sales that Endurall claimed to have lost to the number of sales that DHE actually made; although DHE actually made fewer sales than predicted, Woods said that this measurement was prone to variation because of the Volatile nature of the rod guide business and should be more equal when averaged over time.
• Woods maintained that defendant’s suggestion that the proper measure of damages, “gross sales -minus expenses equals net profit,” was “not a complete picture of a damage model” and was “way too simplistic.” |17Woods also said that the defendant’s .suggested methodology was not what he was taught, is not included in any valuation practice guide and was not an industry standard. Notably, Edwards did not secure his own expert to challenge Woods’ projections or to calculate any more reasonable alternative.
After considering all of the valuation evidence, the court gave its reasons for the $600,000 award:
Okay. The numbers, Mr, Woods, Ben Woods, was the sole expert in the case, even though very rigorously cross-examined by Mr. McMichael, and I certainly take into account all-all of those arguments. ' They’ were good arguments. But I do find that Mr. Woods’ methodology was acceptable, and I think his — I think his numbers are acceptable.
However, I will say that for reasons stated in the defendants’ pretrial brief and argued at the trial, I do think at some point in time these — that the — the degree .of speculation goes up,- up, up, and I think there is a cutoff in time where anything past that is just too speculative. Again, I said for reasons already stated in the defendants’ brief.
And I also had the additional thought of, you know, technology. I’m . not sure that, that that was brought out by anybody. But, you know, technology,, as we all know, changes real — changes real fast. .There may be. a point.,in time where a rod guide is not even — not even necessary or useful anymore for whatever reason.
.But — so somewhat arbitrary, 1 agree. But I’m — I am going to - award damages ■through 2016, and at that, if my math is right, and I think it is..., [After reviewing the expert’s- reports] the $185.005.38 is for past lost sales. And then if you total the next ... present value of. future lost cqntribution .... if you total those first nine entries, you’re going to get to a number, $631,996.55. Now there’s also the 10 percent commission that has to be factored in.... So if we can work in round numbers, I’m going to reduce the $631,996.55. to just an even $600,000. And that will be the award of damages in, this case. Plus all costs will be assessed to the defendant, and the attorney’s fees ... in the amount of $62,378. ,.. with court costs ... of $1,629.50,
|18On appeal, defendant takes issue with a number of aspects of the trial court’s ruling. First, he argues that the proper measure of damages is net loss: gross profits minus expenses. Louisiana Smoked Prods., Inc. v. Savoie Sausage & Food Prods., Inc., 95-932 (La.App. 3rd Cir.3/27/96), 673 So.2d 248, aff'd in part, 96-1716 (La.7/1/97), 696 So.2d 1373. Although this may be an accurate statement of the measure of damages in a case where (1) lost, profits alone are at issue and (2) those profits may be established more clearly, in this case, the damage to Endu-rall from Edwards’ conduct was harder to quantify. Moreover, the statute allows damages “for .the loss sustained and the *1124 profit of which he has been deprived,” so an injured party may recover damages for “the loss sustained” in addition to damages for lost profits.
The quarterly sales figures for Endurall were highly volatile and reflected irregularly large and small orders from customers whose needs differed depending upon their own circumstances. Further, Woods explained at trial that his methodology was standard industry practice for evaluating damages to a company, and we observe that both his first and second models were in fairly close agreement.
Not even the direct evidence regarding DHE’s sales made the damages in this case susceptible of mathematical precision. Evidently, DHE’s sales were substantially fewer in number than would be expected if DHE had captured all the business that Endurall claimed to have lost to the competitor. However, as Woods explained, there are many reasons why DHE’s sales numbers might be lower than expected over a short period of hatime and as a startup company, but over time and on average, DHE’s sales numbers would eventually support the model used.
Finally, the trial court recognized the significant uncertainty and generous assumptions built into the plaintiffs damages model; the court awarded the plaintiff only 60% of what it asked for. The court recognized that projected sales over time were speculative and substantially discounted Endurall’s claim for that factor alone, awarding Endurall damages only through 2016 instead of 2020 as it asked. Further, the court recognized that technology might reduce Endurall’s sales over time; that suggestion was not brought o.ut by any party, but the appellant benefitted from the trial court’s observation.
The damage award in this case was a difficult determination given the volatile nature of Endurall’s business, the uncertain accuracy of a number of factors whose quantity had to be assumed, and the credibility determinations that the judge had to make to make its findings of fact. This record reveals no manifest error in the trial court’s findings of fact, and since its damage award was based on its conclusions about the evidence presented and not on mere speculation, we detect no abuse of discretion in the award.
Assignment of Error 4. The District Court erred in awarding damages for the period after the expiration of the noncompetition agreement on July 31, 2015.
Finally, the appellant argues that the trial court should not have extended its award of damages to Endurall past the expiration date of the noncompete agreement because, at that point, Billy Joe Edwards would | wihave been free to start his own company and compete directly with Endurall within Louisiana.
On that point, the record shows that Gary Gardner testified:
Q: Billy Joe’s non-compete runs out at the end of July 2015.[W]hat effect does that have, in your mind, on your ability to compete as of that time?
A: Think the 2015 date is just an arbitrary date now. But that date has been meaningless since last fall. He violated the agreement right off the bat. So, we haven’t had a chance to figure out if he’ll make any impact in 2015, we haven’t really had a chance to put a lot of strategy in place to anticipate his return; he never left[.]
[[Image here]]
Q: If you had had till August of '15 to not have DHE in the market, to not have Billy Joe violate the non-competes, what’s your marketing strategy in that scenario?
*1125 A: We certainly would háve evaluated each of our sales reps and we would have made changes similar to what we did in Oklahoma and Kansas. We went with a much stronger representation there. We [sic] would have given us two years to cement our personal relationships with these customers that have bailed on us because of our reps leaving. I mean the whole landscape of this business would have been different had this not occurred. So I believe we would have been in a completely different position two years from now.
Similarly, Benjamin Woods further explained that his estimate of damage to Endurall extended in time past the end of the noncompete agreement because DHE’s early entry into the market did not give Endurall time to prepare for the competition:
And [a noncompete agreement is] not so much a chance to prevent competition in the future, but it’s a chance for us to prepare for that competition and to insulate ourselves and to transition the client relationships and to transition salesmen and customers without — you get a brief respite from competition with that non-compete that helps you prepare for the event. Had competition not occurred earlier with DHE, then- 2015 would 121be a big date. But, because it did, 2015 is not a very important date anymore; the damage had already been done.
Because the record plainly shows that the defendant’s early entry into the market and violation of the noncompete clause caused Endurall damages that could have been mitigated had the defendant abided by the noncompete clause, we find no legal error in the trial court’s decision to award Endurall damages for lost sales through the end of 2016. Again, the company’s damages are not susceptible' of precise measurement, the preponderance of the evidence showed that the customers prematurely lost to DHE were unlikely to return to Endurall, and, the trial court gave the defendant a substantial break by denying Endurall damages for the years 2017 through 2020.
CONCLUSION
For the above reasons, at appellant’s costs, the judgment of the trial court is AFFIRMED.

. Billy Joe Edwards, Jimmy Starks, David Pattridge, and Gary Gardner.

. This court affirmed the trial court’s rulings concerning the dissolution action in Pattridge v. Starks, 49,239 (La.App.2d Cir.9/24/14), 149 So.3d 820.

. H. Any agreement ... shall be considered an obligation not to do, and failure to perform may entitle the obligee to recover damages for thé loss sustained and the profit of which he has been deprived.

. Notably, the, transcripts of the testimony of three witnesses — David Pattridge, Gary Gardner, and Benjamin Woods — were sealed by the trial court and by agreement of the parties in an effort to protect their proprietary business information. As noted, Pattridge and Gardner were the principals of Endurall, and Benjamin Woods was their CPA expert in business valuation, Likewise, Woods’ report was also sealed. Although This court has access to and has carefully reviewed the sealed information, this opinion protects the proprietary information at issue.

. Woods explained, ''[M]y assignment was not to try to determine the cause for these [sic] loss of customers or to try to understand or identify a specific cause for this event.”

. That memo included citations to the judge’s previous finding that Billy Joe Edwards was promoting Greg/DHE, giving Greg's phone number to people and “much more,” including the pledge of $500,000 of proceeds from the sale of Endurall’s stock to secure the loan to start DHE.

. See, e.g., Am. Bank & Trust Co. of Shreveport v. Boddie, 406 So.2d 694 (La.App. 2d Cir.1981):
Louisiana appellate courts are authorized by La. C.C.P. Article 2164 to render any judgment "which is just, legal and proper upon the record.” However, our jurisprudence has qualified this codal provision with the general rule that a defense not raised and passed upon in the trial court may not be raised for the first time on appeal. Young v. Warner, 283 So.2d 547 (La.App. 1st Cir.1973); X-L Finance Co. v. Fenske, 197 So.2d 182 (La.App. 1st Cir.1967). Furthermore, Rule 9A (see now U.R.C.A. Rule 1-3) of the Uniform Rules for the Courts of Appeal provides that we "ordinarily will review only issues which were submitted in the trial court ... unless the interest of justice requires otherwise.”

. The judge did find that Edwards was competing against Endurall in Louisiana; at issue in this assignment of error is the measure of loss attributable to the conduct that was *1120 clearly in-state versus what happened outside of the state.

. Like the transcript of his testimony, Woods’ report (which was admitted into evidence) is included in this record as a sealed exhibit, and we have endeavored to protect the privileged information therein.